**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF INDIANA**
**NEW ALBANY DIVISION**

| | | |
|---|---|---|
| HEARTBEAT PERFUSION SOLUTIONS, INC., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 4:25-cv-00162-TWP-TAB |
| | ) | |
| PERFUSION SOLUTION INC., | ) | |
| JOSEPH CHECK, | ) | |
| JAKE SETZER, | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS**
**AND ALTERNATIVE REQUESTS TO TRANSFER**

This matter is before the Court on a Motion to Dismiss filed by Defendant Perfusion Solution Inc. ("PSI") ([Filing No. 24](#)) and a Motion to Dismiss filed by Defendants Joseph Check ("Check") and Jake Setzer ("Setzer") ([Filing No. 38](#)) (PSI, Check, and Setzer collectively referred to as the "Defendants"). Plaintiff Heartbeat Perfusion Solutions, Inc. ("Heartbeat") initiated this action alleging misappropriation of trade secrets, breach of contract, and tortious interference with contracts among other things. After Heartbeat filed its Amended Complaint, the Defendants filed their Motions to Dismiss based on a lack of personal jurisdiction and improper venue. The Defendants alternatively ask the Court to transfer this case to the Eastern District of Wisconsin. For the reasons discussed below, the Court **denies** the Motions to Dismiss and alternative requests to transfer the case to the Eastern District of Wisconsin.

## I.    BACKGROUND

The following facts are not objectively true, but as required when reviewing a motion to dismiss, the Court accepts as true all factual allegations in the complaint and draws all inferences

in favor of Heartbeat as the nonmoving party. *See Bielanski v. Cnty. Of Kane*, 550 F.3d 632, 633 (7th Cir. 2008).

Heartbeat is an Indiana corporation based in Sellersburg, Indiana (Filing No. 1-1 at 1). It provides perfusion services to surgical provider customers. *Id.* at 2. These services include maintaining a patient's blood flow, body temperature, and respiratory functions during medical procedures, such as open-heart surgery. *Id.*

PSI is a Wisconsin corporation with its principal place of business in Beloit, Wisconsin (Filing No. 24-1 ¶ 5). PSI is a competitor of Heartbeat and offers services to fifty partner hospitals across the United States (Filing No. 1-1 at 3; Filing No. 24-1 ¶ 4). Two of its customers are in Indiana (Filing No. 24-1 ¶ 7). According to PSI's chief executive officer, David Malkow ("Malkow"), these two customers represent less than five percent of PSI's total revenue. *Id.* ¶¶ 2, 6. Although PSI does not own property in Indiana, it does lease property in Terre Haute, Indiana, and, as of March 5, 2026, its website "pinpoint[ed] on a national map several Indiana locations where PSI conducts business, including Fort Wayne, Lafayette, Indianapolis, Beech Grove, Terre Haute, and Bloomington." (Filing No. 24-1 ¶ 6; Filing No. 45-2 ¶¶ 3, 4). As of the same date, the website also advertised at least one job posting in Indiana (Filing No. 45-2 ¶ 5). PSI has one employee in Indiana (Filing No. 26 at 4). PSI is also registered to do business in Indiana as a foreign corporation and has designated Malkow as a registered agent at an address in Fishers, Indiana (Filing No. 45-2 ¶ 2).

Around 2021, PSI expressed interest in acquiring Heartbeat (Filing No. 1-1 at 3). Malkow expressed renewed interest in a possible acquisition or partnership between the two entities in or about 2023. *Id.* at 6. In other communications, Malkow discussed acquiring customers in Indiana and recruiting perfusionists in Indianapolis (*Id.* at 66–67; Filing No. 45-1 ¶ 12–13).

2

Check and Setzer are both citizens of Wisconsin and former employees of Heartbeat (Filing No. 1-1 at 1–2). Heartbeat originally hired Check as a perfusionist in or about November 2021. *Id.* at 3. Around August 2023, Heartbeat promoted Check to Vice President of Operations. *Id.* Setzer initially joined Heartbeat in or about June 2022 as an independent sales contractor and was subsequently promoted to a full-time position as Heartbeat's Director of Sales in or about fall 2023. *Id.* at 4.

Check and Setzer each signed Heartbeat's "Staff Member Handbook." *Id.* at 3, 4. Among other things, the Staff Member Handbook provides the following:

> Staff Member agrees not to disclose any Heartbeat Perfusion Solutions trade secrets or any confidential or proprietary information of Heartbeat Perfusion Solutions, Heartbeat Perfusion Solutions Staff Members, Clients, or patients of Clients. Heartbeat Perfusion Solutions Staff Member further agrees not to compete either as a direct competitor or with a competing company at the Client assignment where Heartbeat Perfusion Solutions Staff Member has been placed by Heartbeat Perfusion Solutions.

*Id.* at 30.

In addition to the Staff Member Handbook, Check and Setzer each also signed an Executive Employment Agreement in connection with their respective promotions.[1] *Id.* at 3–4. After negotiations, Check signed his Executive Employment Agreement in person in Wisconsin on August 8, 2023 (Filing No. 39-1 at 8). Setzer signed his Executive Employment Agreement while he was in Wisconsin via DocuSign on November 15, 2023 (Filing No. 1-1 at 4; Filing No. 39-2 ¶ 6). Both contracts state that the "[a]greement shall be governed by and construed and interpreted in accordance with the laws of Indiana." (Filing No. 1-1 at 45, 58). Setzer's Executive Employment Agreement additionally has Heartbeat's Indiana address for its P.O. Box in the header. *Id.* at 48.

---

[1] The Court understands that there is a dispute regarding whether Check signed an Executive Employment Agreement (*See, e.g.,* Filing No. 24-2 ¶ 12; Filing No. 39-1 at 8). As is proper at this stage of the litigation, the Court construes all factual disputes and reasonable inferences in favor of Heartbeat.

The respective contracts impose obligations on Check and Setzer (each referred to as "Executive" in the applicable contract), prohibiting disclosure of confidential information and restricting the ability of the Executive to compete with Heartbeat or solicit Heartbeat's employees and customers. The covenant not to disclose provides, in relevant part that the "Executive will not disclose or use at any time, either during the Term or thereafter, any Confidential Information . . . of which Executive is or becomes aware . . . ." *Id.* at 41, 54. In the agreements, Confidential Information is a defined term, and it means:

> [I]nformation that is not generally known to the public (including the existence and content of this Agreement) and that is used, developed, or obtained by [Heartbeat] in connection with its business, including, but not limited to, information, observations, and data obtained by Executive while employed by [Heartbeat] or any predecessors thereof (including those obtained prior to the date of this Agreement) concerning (i) the business or affairs of [Heartbeat] (or such predecessors), (ii) products or services, (iii) fees, costs and pricing structures, (iv) designs, (v) analyses, (vi) drawings, photographs and reports, (vii) computer software and hardware, including operating systems, applications and program listings, (viii) flow charts, manuals and documentation, (ix) databases and data, (x) accounting and business methods, (xi) inventions, devices, new developments, methods, and processes, whether patentable or unpatentable and whether or not reduced to practice, (xii) customers and clients (and all information with respect to such persons) and customer or client lists, (xiii) suppliers (and all information with respect to such persons) or supplier lists, (xiv) other copyrightable works, (xv) all production methods, processes, technology, and trade secrets, and (xvi) all similar and related information in whatever form. Confidential Information will not include any information that has been published in a form generally available to the public prior to the date Executive proposes to disclose or use such information. Confidential Information will not be deemed to have been published merely because individual portions of the information have been separately published, but only if all material features comprising such information have been published in combination.

*Id.* at 42, 55. The covenant not to compete provides:

> Executive will not, and will cause his or her affiliates not to, directly or indirectly, through or in association with any third party, in any territory which [Heartbeat] operates as of the time Executive is no longer employed by, consulting for, serving as a board member of, or no longer otherwise works for, [Heartbeat], (i) engage in, market, sell, or provide any products or services which are the same or similar to

or otherwise competitive with the products and services sold or provided by [Heartbeat] . . . .

*Id.* at 40, 53. The covenant not to solicit provides:

> Executive will not, and will cause his or her affiliates not to, directly or indirectly, through or in association with any third party (1) call on, solicit, or service, engage or contract with, or take any action which may interfere with, impair, subvert, disrupt, or alter the relationship, contractual or otherwise, between [Heartbeat] and any current or prospective customer, supplier, distributor, developer, service provider, licensor, or licensee or other material business relation of [Heartbeat], (2) divert or take away the business or patronage (with respect to products or services of the kind or type developed, produced, marketed, furnished, or sold by [Heartbeat]) of any of the clients, customers, or accounts, or prospective clients, customers, or accounts, of [Heartbeat] or (3) attempt to do any of the foregoing, either for Executive's own purposes or for any other third party . . . Executive will not, and will cause his or her affiliates not to, directly or indirectly, through or in association with any third party (1) solicit, induce, recruit, or encourage any employees or independent contractors of or consultants to [Heartbeat] to terminate their relationship with [Heartbeat] or take away or hire such employees, independent contractors, or consultants or (2) attempt to do any of the foregoing, either for Executive's own purposes or for any other third party.

*Id.* at 40–41, 53–54. The covenant not to compete and the covenant not to solicit for Check last for one year following the termination of his employment. *Id.* at 38, 40. For Setzer, they last for two years following the termination of his employment. *Id.* at 51, 53. Check's agreement was in place until either he or Heartbeat terminated his employment. *Id.* at 34. Setzer's agreement provided for a one-year term, with automatic renewals of additional one-year periods, unless the agreement was terminated. *Id.* at 48. Both agreements provided that the Executive was employed on an "at-will basis." *Id.* at 34, 48.

Setzer also entered into a Bonus and Repayment Agreement with Heartbeat on August 24, 2023. *Id.* at 23–24. This agreement displays Heartbeat's Indiana address for its P.O. Box in the header. *Id.* at 89. Heartbeat issued a total of $14,268.10 in bonus payments under the agreement at different times which were subject to repayment percentages upon Setzer's resignation. *Id.* at 24.

5

Check's responsibilities at Heartbeat included managing "customer communications, perfusion services scheduling, and contracts" across the nation. *Id.* at 4. Check has provided statements regarding the limits of his interactions with Indiana (Filing No. 39-3 ¶¶ 10–11). Heartbeat, however, has emphasized Check's connection to the state, including receiving compensation from Indiana and accessing information "created for, paid for, and stored in Indiana" (Filing No. 39-1 at 4). Check reported to Heartbeat's president, who resided in Indiana (Filing No. 45-1 ¶ 4). Check also supervised personnel and contractors of Heartbeat who were regularly located and worked in Indiana. *Id.*

Check visited Indiana at least three times during his employment at Heartbeat. *Id.* ¶ 5. These trips included visiting Heartbeat's office in Sellersburg, Indiana, attending a conference and business development dinner with Heartbeat prospects in Terre Haute, Indiana, and attending a conference for a Heartbeat target in Indianapolis, Indiana. *Id.* Furthermore, "Check was responsible for negotiating contracts with those two Indiana prospects… [and] held non-public, confidential information of the prospects' identities/personnel, relationship/background, research, status of discussions, and Heartbeat's strategies to be awarded contracts for perfusion services from them and other Heartbeat targets." *Id.* These two prospects eventually awarded contracts to PSI "not long after Check departed from Heartbeat." *Id.*

Setzer's role at Heartbeat similarly had connections to Indiana, including receiving compensation from Indiana and accessing information "created for, paid for, and stored in Indiana." (Filing No. 39-1 at 5). He also traveled to Indiana on at least two separate occasions with Check to visit prospective clients of Heartbeat in Terre Haute and Indianapolis (Filing No. 45-1 ¶ 5). His duties included "researching and connecting with prospective customers across the United States, including Indiana." *Id.* ¶ 6. Setzer received training from and reported to Heartbeat

employees who resided and worked in the State of Indiana. *Id.* ¶¶ 6–7. As a result of his work, Setzer accumulated a list of over 5,000 industry connections on LinkedIn (Filing No. 1-1 at 9). Heartbeat instructed Setzer to keep these connections "'private' from disclosure to other connections, including the public or competitors." *Id.*

Check and Setzer both knew Heartbeat's confidential information and trade secrets. *Id.* at 16. This information included confidential information on the details and plans of Heartbeat customers, prospective customers, and employees. *Id.* The information related to active prospects is valuable, especially given the "significant upfront time and expense" required during sales cycles that can last for several months or more. *Id.* at 14. Check and Setzer accessed Heartbeat's business records, including the confidential information and trade secrets, from servers located in Indiana (Filing No. 45-1 ¶ 9). They only had access to and knowledge of Heartbeat's confidential information and trade secrets through their employment with Heartbeat (Filing No. 1-1 at 16).

Check resigned from Heartbeat on or about August 1, 2024. *Id.* at 6. In the weeks leading up to his resignation, Check disregarded duties to Heartbeat by failing to respond to customers, allegedly resulting in missed business opportunities and leading one customer to transfer its business to PSI. *Id.* In the days before his resignation, Check emailed "a highly-confidential, detailed, and competitively-valuable customer contract belonging to Heartbeat" and "highly-confidential, detailed, and competitively-valuable process documents and course evaluation documents belonging to Heartbeat" to his personal email address without Heartbeat's knowledge or approval. *Id.* at 7.

Setzer resigned from Heartbeat on October 4, 2024. *Id.* at 8–9. When Heartbeat informed him that he would promptly be disconnected from Heartbeat's computer systems, Setzer tried to rescind his resignation and make it effective in 30 days. *Id.* Heartbeat refused that request. *Id.*

7

Setzer did not transfer the LinkedIn connections that he obtained through his employment and training at Heartbeat despite receiving instructions from Heartbeat to transfer these connections. *Id.* at 8. Before his resignation, Setzer took an excel file from Heartbeat that contains information on thousands of prospective hospital clients, which he had helped develop through the course of his employment with Heartbeat. *Id.* at 9.

Check went to work for PSI "immediately after his resignation." *Id.* at 6. Setzer also joined PSI following his resignation. *Id.* at 9. Both joined in the same capacity as they had at Heartbeat. *Id.* at 6, 9. Defendants maintain that the activities related to the recruitment and hiring of these employees occurred in Wisconsin (Filing No. 24-1 ¶ 10).

After hiring Check and Setzer, PSI obtained contracts with two Indiana customers that Check and Setzer had personally met during their visits to Indiana while working for Heartbeat (Filing No. 45-1 ¶ 10). According to Heartbeat, these contracts could generate over $1,000,000 in income annually to PSI. *Id.* Heartbeat alleges that PSI obtained these customers, and others, with the assistance of Check and Setzer and their knowledge of Heartbeat's confidential information and trade secrets, in part based on the short sales cycle through which PSI obtained these customers. *Id.* ¶¶ 11, 14.

PSI hired Heartbeat perfusionists who were known to Check and Setzer. *Id.* ¶ 11. One of these perfusionists, an individual identified as "KK," was recruited by Check or Setzer (or both) (Filing No. 1-1 at 9). Check, who personally handled KK's onboarding at Heartbeat, had removed restrictive covenants from KK's agreement with Heartbeat without notifying Heartbeat or obtaining its approval. *Id.* at 10.

Since joining PSI, Check has visited a customer of PSI in Indiana (Filing No. 24-1 ¶ 15). These visits have been debated among the parties, including issues regarding the number of visits

that Check has made and the exact nature of the customer's relationship to PSI prior to Check's employment at PSI (Filing No. 45-2 ¶ 8). Viewed in the light most favorable to Heartbeat, as is required at this stage, Check has visited this customer of PSI in Indiana three times, and, while there was a pre-existing relationship between this entity and PSI, the entity was not a pre-existing customer of PSI prior to Check joining PSI. *Id.* All of Setzer's work since joining PSI has been conducted outside of Indiana, and "[he does] not have an office, phone number, mailing address or any other presence in Indiana." (Filing No. 24-3 ¶ 4).

Heartbeat alleges that Defendants have used the confidential information and trade secrets that Check and Setzer took from Heartbeat to their benefit and to the detriment of Heartbeat (Filing No. 1-1 at 10). Heartbeat has sent correspondence to each of them to ensure against improper use and to demand the return of the information, among other things. *Id.* at 10-11. After receiving the letter, Malkow sent a message to Heartbeat's owner calling him a racially derogatory name but otherwise did not respond. *Id.* at 11. Check and Setzer denied the allegations. *Id.* at 11. On or about January 29, 2026, Check and Setzer did produce a box of items and a thumb drive that is subject to Heartbeat's review but have not provided the LinkedIn account data or coordinated with Heartbeat regarding taking measures for the data stored in their personal email accounts and other accounts (Filing No. 45-2 ¶ 10).

On or about January 31, 2025, Heartbeat initiated an action against Setzer in Small Claims Court for Clark County, Indiana (Filing No. 1 ¶ 1). On or about July 17, 2025, Heartbeat subsequently filed an Amended Complaint in the Circuit Court for Clark County, Indiana, and Check and PSI were named as additional defendants. *Id.* ¶ 2. On August 15, 2025, the Defendants removed this action to federal court. *Id.* In its Amended Complaint, Heartbeat requests injunctive relief and damages for the Defendants' misappropriation of trade secrets, breach of contract, and

9

tortious interference with contracts among other things. Defendants filed their Motions to Dismiss, arguing a lack of personal jurisdiction and improper venue. Defendants alternatively ask the Court to transfer the case to the Eastern District of Wisconsin.

## II. LEGAL STANDARD

### A. Motion to Dismiss under Rule 12(b)(2)

Federal Rule of Civil Procedure Rule 12(b)(2) requires dismissal of a claim where personal jurisdiction is lacking. When deciding a Rule 12(b)(2) motion, the court accepts all factual allegations in the complaint as true and draws all reasonable inferences in favor of the plaintiff if they weigh on personal jurisdiction. *Int'l Med. Grp., Inc. v. Am. Arb. Ass'n*, 149 F. Supp. 2d 615, 623 (S.D. Ind. 2001). If the complaint, however, consists of conclusory allegations unsupported by factual allegations, the complaint fails the liberal standard of Rule 12(b). *Id.* The complaint does not need to include factual allegations concerning personal jurisdiction, but if the defendant moves to dismiss under Rule 12(b)(2), the plaintiff "bears the burden of demonstrating the existence of jurisdiction." *Purdue Rsch. Found. V. Sanofi-Synthelabo, S.A.*, 338 F.3d 773, 782 (7th Cir. 2003). The extent of a plaintiff's burden is dependent upon the method by which the court determines the issue of personal jurisdiction. *Id.* "When the . . . court holds an evidentiary hearing to determine [personal] jurisdiction, the plaintiff must establish [personal] jurisdiction by a preponderance of the evidence." *Id.* But where, as here, the court determines personal jurisdiction based only on reference to submissions of written materials, the plaintiff simply needs to make a prima facie case of personal jurisdiction. *Id.; see also GCIU-Emp. Ret. Fund v. Goldfarb Corp.*, 565 F.3d 1018, 1023 (7th Cir. 2009).

In determining whether the plaintiff has met the prima facie standard, the plaintiff is entitled to a favorable resolution of all disputed relevant facts. *uBID, Inc. v. GoDaddy Grp., Inc.*, 623 F.3d

10

421, 423–24 (7th Cir. 2010). If the defendant has submitted evidence in opposition to the implementation of jurisdiction, however, "the plaintiff must go beyond the pleadings and submit affirmative evidence supporting the exercise of jurisdiction." *Purdue*, 338 F.3d at 782–83. This evidence submitted by the defendant may include affidavits, unless the affidavits merely contain conclusory assertions that the court lacks personal jurisdiction over the defendant. *Id.* at 783 & n.13 (quoting *Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002)).

**B.**      **Motion to Dismiss for Improper Venue under Rule 12(b)(3)**

In resolving a Rule 12(b)(3) motion, the court accepts any allegation in the complaint as true, unless contradicted by the defendant's affidavits. *See Nagel v. ADM Inv. Servs., Inc.*, 995 F. Supp. 837, 843 (N.D. Ill. 1998). The plaintiff bears the burden of establishing that venue is proper. *Moore v. AT & T Latin Am. Corp.*, 177 F. Supp. 785, 788 (N.D. Ill. 2001). Further, the court resolves any factual conflicts and draws any reasonable inferences in the plaintiff's favor. *Id.* Finally, the court is not obligated to limit its consideration to the pleadings when deciding a motion to dismiss under Rule 12(b)(3). *Faulkenberg v. CB Tax Franchise Sys., LP*, 637 F.3d 801, 809–10 (7th Cir. 2011).

**C.**      **Transfer of Venue**

If the current venue is proper, a party may seek a change of venue pursuant to 28 U.S.C. § 1404(a), which states, "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." Under 28 U.S.C. § 1404(a), transfer is "appropriate where '(1) venue is proper in the transferor district; (2) venue and jurisdiction are proper in the transferee district; and (3) the transfer will serve the convenience of the parties, the convenience of the witnesses, and the interest of justice.'" *Bogard v. TikTok Inc.*,

725 F. Supp. 3d 897, 904 (S.D. Ind. 2024) (quoting *Commissioning Agents, Inc. v. Long*, 187 F. Supp. 3d 980, 985 (S.D. Ind. 2016)). The moving party has the burden of "establishing that 'the transferee forum is clearly more convenient.'" *Id.* (quoting *Coffey v. Van Dorn Iron Works*, 796 F.2d 217, 219–20 (7th Cir. 1986)).

### III.   DISCUSSION

The Defendants seek dismissal of this action pursuant to Rule 12(b)(2) for lack of personal jurisdiction and Rule 12(b)(3) for improper venue. In the alternative, the Defendants argue this case should be transferred to the Eastern District of Wisconsin.

As another district court within the Seventh Circuit succinctly noted, "jurisdiction is a threshold requirement that must be satisfied before a court can pass judgments on the merits." *Rawlins v. Select Specialty Hosp. of Nw. Ind., Inc.*, No. 13 C 7557, 2014 WL 1647182, at \*2 (N.D. Ill. Apr. 23, 2014). "The court must satisfy itself that it can exercise personal jurisdiction over [defendants] before it addresses the merits of the case. Accordingly, the court must consider [the] motion to dismiss for lack of personal jurisdiction under Rule 12(b)(2) before it can address the Rule 12(b)(3) . . . motions." *Id.* "If the court determines that it lacks personal jurisdiction over [defendants], it would be improper for this court to reach the merits of the case." *Id.* For this reason, the Court first reviews the Defendants' Motions to Dismiss under Rule 12(b)(2).

### A.   Personal Jurisdiction

"If jurisdiction is exercised on the basis of a federal statute that does not authorize nationwide service of process, the law requires a federal district court to determine if a court of the state in which it sits would have personal jurisdiction."[2] *Philpot v. Dot Com Plus, LLC*, No. 1:14–

---

[2] The federal statute in this litigation, the Defend Trade Secrets Act, does not authorize nationwide service of process. *See Mission Measurement Corp. v. Blackbaud, Inc.*, 287 F. Supp. 3d 691, 706 (N.D. Ill. 2017). Therefore, determining personal jurisdiction in this case is governed by Indiana law.

cv–01980–TWP–DKL, 2015 WL 4742099, at *1 (S.D. Ind. Aug. 11, 2015) (citation omitted). Indiana's long-arm statute, Indiana Trial Rule 4.4(A), governs personal jurisdiction in Indiana. "Although Rule 4.4(A) enumerates eight bases for the assertion of jurisdiction on the basis of a defendant's actions, the rule also includes a provision that 'a court of this state may exercise jurisdiction on any basis not inconsistent with the Constitutions of this state or the United States.'" *Annie Oakley Enters. V. Sunset Tan Corp. & Consulting, LLC*, 703 F. Supp. 2d 881, 886 (N.D. Ind. 2010) (quoting Ind. R. Tr. P. 4.4(A)). Therefore, a court has personal jurisdiction to the limit allowed by the Federal Due Process Clause. *LinkAmerica Corp. v. Cox*, 857 N.E.2d 961, 966–67 (Ind. 2006).

For a court to have personal jurisdiction over a defendant, the Due Process Clause requires that the defendant have "certain minimum contacts with [the state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945) (quoting *Milliken v. Meyer*, 311 U.S. 457, 463 (1940)). Under federal due process standards, personal jurisdiction can be either specific or general. "If the defendant's contacts with the state are so 'continuous and systematic' that the defendant should reasonably anticipate being haled into the courts of that state for any matter, then the defendant is subject to general jurisdiction." *LinkAmerica*, 857 N.E.2d at 967 (citing *Helicopteros Nacionales de Colombia, S. A. v. Hall*, 466 U.S. 408, 415 n.9 (1984)). "If the defendant's contacts with the forum state are not 'continuous and systematic,' specific jurisdiction may be asserted if the controversy is related to or arises out of the defendant's contacts with the forum state." *Id.* (citing *Helicopteros*, 466 U.S. at 418 & n.8). "Specific jurisdiction requires that the defendant purposefully availed itself of the privilege of conducting activities within the forum state so that

13

the defendant reasonably anticipates being haled into court there." *Id.* (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474–75 (1985)).

Specific jurisdiction exists when a defendant has purposefully directed its activities at the forum and the cause of action results from alleged injuries that arise out of or relate to those activities. *See Burger King*, 471 U.S. at 472. In *Burger King*, the Supreme Court explained the "constitutional touchstone" of "minimum contacts" for personal jurisdiction:

> The unilateral activity of those who claim some relationship with a nonresident defendant cannot satisfy the requirement of contact with the forum State. . . . [I]t is essential in each case that there be some act by which the defendant purposefully avails itself of the privilege of conducting activities within the forum State, thus invoking the benefits and protections of its laws.

> This "purposeful availment" requirement ensures that a defendant will not be haled into a jurisdiction solely as a result of "random," "fortuitous," or "attenuated" contacts, or of the unilateral activity of another party or a third person. Jurisdiction is proper, however, where the contacts proximately result from actions by the defendant himself that create a substantial connection with the forum State. Thus where the defendant deliberately has engaged in significant activities within a State, or has created continuing obligations between himself and residents of the forum, he manifestly has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum as well.

*Id.* at 474–76 (internal citations, quotation marks, and footnote omitted). The Supreme Court has recently affirmed the idea that suit can arise out of or relate to the defendant's activities, rejecting a strict causation-only approach. *Ford Motor Co. v. Mont. Eight Jud. Dist. Ct.*, 592 U.S. 351, 362 (2021). "[A] defendant's contacts with the forum may 'relate to' the plaintiff's claims even in the absence of a 'strict causal relationship' between the contacts and claims." *Myer ex rel. B.D. v. Samsung SDI Co.*, 91 F.4th 856, 862 (7th Cir. 2024) (citing *Ford Motor Co.*, 592 U.S. at 361). What courts must ensure is that the defendant, the forum, and the litigation are related sufficiently for the court to have specific jurisdiction. *Id.* (citing *Ford Motor Co.*, 592 U.S. at 371). Heartbeat does

14

not assert that the Court has general jurisdiction over the Defendants. Therefore, the Court focuses its discussion on specific jurisdiction.

The Seventh Circuit has ruled that specific jurisdiction exists over a defendant if that defendant has (1) purposefully availed itself of the forum state, (2) the injuries alleged by the plaintiff arise out of or relate to the defendant's contact with forum state, and (3) exercising personal jurisdiction over the defendant comports with traditional notions of fair play and substantial justice. *Id.* at 861. When determining specific jurisdiction, courts will consider if the defendant has engaged in conduct in the forum state to the extent that it would be foreseeable that the defendant would be haled into court in the forum state. *See World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). Furthermore, personal jurisdiction must arise out of or relate to contacts between the defendant and the forum state that the defendant itself creates. *Walden v. Fiore*, 571 U.S. 277, 284 (2014). Personal jurisdiction is not appropriate where the defendant's contact with forum state is merely the result of the defendant's relationship to the plaintiff, though the defendant's contact with the forum may be intertwined with the defendant's transactions with the plaintiff or other parties. *Id.* at 286. Structuring the analysis this way ensures that the inquiry into personal jurisdiction is properly focused on the relationship among the defendant, the litigation, and the forum. *Id.* at 291 (citing *Calder v. Jones*, 465 U.S. 783, 788 (1984)).

For determining personal jurisdiction, courts also look beyond mere harm to the plaintiff in the forum when determining if the defendant has purposefully availed itself of the forum. *See Walden*, 571 U.S. at 289-290. For instance, in *Presidio Holdings Inc. v. People Driven Technology, Inc.*, No. 1:24-CV-02912, 2025 WL 947946, at *1, 7 (N.D. Ill. Mar. 30, 2025), the court found that personal jurisdiction did not exist over defendants who consisted of the plaintiff's nonresident former employees and a competitor who each allegedly misappropriated trade secrets from the

plaintiff. The court in *Drayton Enterprises, L.L.C. v. Dunker*, 142 F. Supp. 2d 1177, 1180, 1187 (D.N.D. 2001) reached the same conclusion with a similar set of parties.

In each of those cases, the respective court emphasized the limited and, in some instances, attenuated connections between the defendants and the forum. In *Presidio*, for instance, the court found that the defendants had practically no contact with the forum. *Presidio*, 2025 WL 947946, at *4. Neither of the former employees had any current Illinois-based customers nor solicited business in the forum state. *Id.* The out-of-state competitor had no office in Indiana, one employee, and two customers, and importantly, neither of those customers were central to the plaintiff's claims. *Id.* at *5. The contacts that the former employees did have were not strong enough: (1) working remotely with outside contractors based in the forum state, (2) engaging with customers with satellite offices in the forum state but based elsewhere, (3) being an account manager for a company based in the forum, but never visiting that company, and (4) occasional interaction with one employee who worked remotely in the forum. *Id.* at *4–5

The court in *Drayton Enterprises* similarly noted that the defendants had no connection to the forum beyond the alleged tort. 142 F. Supp. 2d at 1185. The competitor did not have any "offices, agents, employees, or property in [the forum state], and it neither [shipped] to nor [received] products from the [forum state]." *Id.* at 1183. Additionally, the court found that the employee's connection to the forum state was too attenuated since he had not worked there for four years. *Id.* He also lived in a different state, owned no property in the forum, and disclosed trade secrets outside of the forum. *Id.* The only alleged connection was the injury that the plaintiff felt in the forum, which, by itself, was insufficient for personal jurisdiction. *Id.* at 1185. However, effects on the plaintiff in the forum state can be relevant in determining personal jurisdiction. *See Calder*, 465 U.S. at 789.

In determining personal jurisdiction, courts analyze whether the defendant's contact was purposefully directed at the forum. *See Felland v. Clifton*, 682 F.3d 665, 674 (7th Cir. 2012). In one case, for instance, the court held that a defendant with sales in a forum state representing 1.8% of its total gross sales nationwide directed its conduct at the forum and was subject to personal jurisdiction since it "explicitly provided that [forum state] residents could purchase its products through [its interactive] website," sent a confirmation after the sale with the customer's forum state address, and shipped the allegedly infringing product to the forum state. *See Curry v. Revolution Laboratories, LLC*, 949 F.3d 385, 392, 399, 402-03 (7th Cir. 2020); *see also Illinois v. Hemi Grp., LLC*, 622 F.3d 754, 757-58 (7th Cir. 2010) (concluding that the court had personal jurisdiction over a defendant who made sales in the forum through its interactive website where customers could calculate shipping charges through entering their zip codes).

One particularly relevant case is *My Fav Electronics, Inc. v. Currie*, No. 24 C 1959, 2025 WL 1768888 (N.D. Ill. June 26, 2025). That case involved a plaintiff that was incorporated and based in Illinois bringing suit against a nonresident former employee and a competitor for claims of misappropriation of trade secrets, tortious interference with employment agreements and with the plaintiff's customer relationships, unjust enrichment, and aiding and abetting breaches of fiduciary duty. *Id.* at *1–2. The plaintiff alleged that the competitor induced the former employee to transmit the plaintiff's confidential information and trade secrets. *Id.* at *3. The competitor also hired the former employee, and they allegedly targeted the plaintiff's customers, and successfully wrestled some of them away. *Id.* at *3–4. The competitor company and its chief executive officer moved to dismiss for lack of personal jurisdiction. *Id.* at *2.

In her role at the plaintiff company, the former employee had a nationwide focus, and she had access to confidential information, which she subsequently downloaded and sent to the

17

competitor. *Id.* at *2–3. The competitor was an out-of-state business who did not have an office or facilities in Illinois but did have the following contacts: (1) customers located in forum that constituted five percent of the competitor's total customers; (2) a handful of employees that live in the forum but commute to work out-of-state; (3) biannual board meetings in the forum; and (4) three members of a private equity firm that owned a majority of the competitor's equity located in the forum. *Id.* at *3. Additionally, the plaintiff alleged that the former employee provided information that helped the competitor acquire the plaintiff's prospects and customers, including three customers in the forum state. *Id.* Although many of the communications between the former employee and the competitor occurred out-of-state, "the *harm* that [the plaintiff claimed] to have suffered as a result of that misconduct still arises from [the competitor's] resultant use of the trade secrets in [the forum state] (among other places)." *Id.* at *5. Additionally, the court found that the claims were related to the competitor's contacts because it "reached directly into [the forum state] and competed with [the plaintiff] for customers in [the forum state] using [the plaintiff's] misappropriated trade secrets." *Id*. at *6. In the end, the court held that it had personal jurisdiction. *Id.* at *3.

The Defendants claim that this case is analogous to *Presidio* and *Drayton Enterprises*, arguing that the Court should decline to exercise jurisdiction because the only relevant conduct is the acquisition of trade secrets by a competitor through nonresident employees (Filing No. 26 at 10–13; Filing No. 39 at 9). The Court does not agree. Unlike the defendants in *Presidio* and *Drayton Enterprises*, who had practically no contacts with the forum state related to the litigation, the Defendants here have several key contacts with the forum state. Through their employment, Check and Setzer had several, consistent connections, including their employment contracts, interactions with employees that resided in Indiana, in addition to Check interacting with

18

contractors, and communication with Indiana customers and prospects, including two in-person visits to Indiana. Unlike the defendant in *Drayton*, whose work with a North Dakota business ceased four years before subsequently joining a competitor, there was a small gap in time between the employees leaving Heartbeat and joining PSI, making the connection far less attenuated.

PSI also has much more substantial interactions with Indiana than their analogous counterparts in the cited cases. While they do not have an office in Indiana, PSI has leased property in Terre Haute, Indiana and has listed several Indiana locations on its website. It has registered to do business in Indiana and has appointed a registered agent with an address in Fishers, Indiana. It has one employee in Indiana and two customers, which are also the subject of Heartbeat's claims.

Here, the quantity and quality of contacts that the Defendants have with Indiana are more analogous to the direct and substantial conduct of defendants in cases cited by Defendants in which the court properly exercised personal jurisdiction (Filing No. 26 at 12; Filing No. 39 at 10). Just as the defendants did in *My Fav*, the Defendants here have allegedly used misappropriated confidential information and trade secrets to target the customers and prospects of Heartbeat. Importantly, in both cases, at least some of the targets were located in the forum, in contrast to the facts in *Presidio*.

PSI raises the issue that Heartbeat's settlement offer did not include any customers from Indiana (Filing No. 49 at 8). As in *My Fav*, it is sufficient that some of the alleged customers and prospects are located in the forum state for the purpose of establishing personal jurisdiction. Additionally, as Defendants point out, Heartbeat does not have the burden to prove personal jurisdiction until after the Defendants raised the issue (Filing No. 26 at 2). At that point Heartbeat could and did submit additional evidence proving jurisdiction (*see, e.g.,* Filing No. 45-1).

PSI highlights the fact that Heartbeat's alleged losses related to prospective business with Indiana companies (Filing No. 49 at 8). The Defendants allegedly used trade secrets to unjustly win opportunities with Indiana companies against Heartbeat. The court in *My Fav* specifically noted that the harm done to the plaintiff included lost opportunities. *Id.* at *5.

In some respects, the Defendants here have an even stronger connection with the forum state than defendants in *My Fav*. For instance, Check and Setzer each visited Indiana at least twice in connection with their work at Heartbeat. After joining PSI, Check visited Indiana customers in person. PSI, along with having Check, its employee, physically enter the state, has a lease in Indiana and has listed Indiana locations on its website. PSI has also taken other steps over the years to target the forum, through the employment of an Indiana resident, job postings in Indiana on its website, and the communications regarding a possible acquisition of Heartbeat itself.

Determining personal jurisdiction for a claim of breach of contract requires a context-specific analysis, which includes "examining 'prior negotiations, contemplated future consequences, the terms of the contract, and the parties' course of actual dealing with each other.'" *N. Grain Mktg., LLC v. Greving*, 743 F.3d 487, 493 (7th Cir. 2014) (citing *Purdue*, 338 F.3d at 781). In *Burger King*, the Supreme Court addressed a dispute related to the appellee Rudzewicz and another Michigan resident alleging breaching a franchise agreement with the appellant Burger King, which was headquartered in Miami, Florida. *Burger King*, 471 U.S. at 464, 466. Even though Rudzewicz did not have an office in Florida, negotiated the agreement with the Michigan and Florida offices of Burger King, and signed the agreement without ever visiting Florida, the Supreme Court ruled that the Rudzewicz was subject to personal jurisdiction in Florida. *Id.* at 478–479.

The Supreme Court found that Rudzewicz had understood he was entering into a long-term agreement with an organization that had a headquarters with decision-making power in Florida, such that he should have been able to foresee being haled into court there. *Id.* at 480–81. One indicator the Supreme Court cited was the contract's choice of law provision that stated that the agreement would be governed by Florida law, which made it more reasonably foreseeable to Rudzewicz that he would be haled into court in Florida in connection with the Agreement. *Id.* at 481–82. Additionally, Rudzewicz was aware through his course of dealings with Burger King, including phone calls and other communications, that the decision-making power for Burger King rested in Florida. *Id.* at 480–81. Finally, the court stated that it was not necessary that Rudzewicz actually enter Florida, noting:

> Although territorial presence frequently will enhance a potential defendant's affiliation with a State and reinforce the reasonable foreseeability of suit there, it is an inescapable fact of modern commercial life that a substantial amount of business is transacted solely by mail and wire communications across state lines, thus obviating the need for physical presence within a State in which business is conducted.

*Id.* at 476.

In this case, Check and Setzer entered into a long-term commitment with an Indiana corporation that was headquartered in Indiana. Check's contract had a term for an indefinite period, while Setzer's contract had automatically renewing terms of one year following the initial one-year term, demonstrating long-term commitments. Both contracts had additional restrictive covenants not to compete, solicit employees or customers, or disclose Confidential Information (as defined in their agreements) that survived for at least one year following the termination of the agreements, increasing the duration of their obligations to Heartbeat. The contracts explicitly stated that they would be governed by Indiana law, highlighting the reasonable foreseeability that Check and Setzer would be haled into court in Indiana for a claim arising out of or related to their contracts.

Additionally, Setzer's Executive Employment Agreement and his Bonus and Repayment Agreement each displayed Heartbeat's Indiana address for its P.O. Box in the header of the agreement. *Cf. Tekway, Inc. v. Agarwal*, No. 19-cv-6867, 2020 WL 5946973, at *2 (N.D. Ill. Oct. 7, 2020) (finding contact with Illinois based on defendant employee's contract stating that the company was based in Downers Grove, IL in the footer of the contract).

Through the parties' course of dealing, Check and Setzer had numerous contacts with Indiana. They reported to members of the organization that resided and worked in Indiana, including the President of Heartbeat. Check supervised clinical personnel and contractors of the organization that resided and worked in Indiana. Setzer received training from employees who resided and worked in Indiana. Additionally, they received their pay from Heartbeat, an Indiana company with a bank account in Indiana. Their wide-ranging and ongoing obligations led them to interact with Indiana customers, including visiting customers in Indiana on two separate occasions. It was reasonably foreseeable that Check and Setzer would be haled to litigate claims in Indiana related to these contacts with Indiana in connection with their employment, especially a breach of their employment agreement. Given the number of contacts in Indiana related to the contemplated future consequences, the terms of the contract, and the parties' course of actual dealing with each other, the fact that Check and Setzer negotiated and signed their contracts outside of Indiana will not defeat the Court's personal jurisdiction over them. Taken together with other contacts discussed, the Court finds that the Defendants have purposefully availed themselves of the forum.

The Court also finds that the claims in this suit arise out of or relate to the Defendants' contacts with the forum. The alleged misappropriation of confidential information and trade secrets stored on Heartbeat's servers in Indiana and use of those trade secrets to target customers and employees goes directly to Heartbeat's claims. They relate to PSI's alleged targeting of the Indiana

22

market. In the case of Check and Setzer, the allegations of abruptly going to work for a competitor from whom they solicited Heartbeat's prospective customers and employees while using Confidential Information that they took from Heartbeat squarely falls within the scope of the covenants in their employment agreements. Heartbeat's claim for overpayment of wages to Setzer directly relates to provisions of an associated employment agreement that clearly displays Heartbeat's Indiana address, and those wages and other compensation paid to Check and Setzer came from Heartbeat's Indiana bank account. The actions taken by Check and Setzer also invoke questions of breach of duties owed to their former Indiana employer whose Indiana employees and customers they frequently interacted with and on whose account they occasionally visited Indiana. For the reasons stated above, the Court finds that Defendants had minimum contacts with the forum state sufficient for personal jurisdiction.

The Court is satisfied that the Defendants possess the minimum contacts with the forum state that is required for personal jurisdiction. The final piece of analysis is determining whether the forum exercising personal jurisdiction would comport with the traditional notions of fair play and substantial justice. *See Purdue*, 338 F.3d at 781. In addressing fairness, courts consider the following factors:

> [T]he burden on the defendant, the forum State's interest in adjudicating the dispute, the plaintiff's interest in obtaining convenient and effective relief, the interstate judicial system's interest in obtaining the most efficient resolution of controversies, and the shared interest of the several States in furthering fundamental substantive social policies.

*Burger King*, 471 U.S. at 477 (internal citations and quotation marks omitted).

Check and Setzer argue that litigating in Indiana would be unduly burdensome, since they are Wisconsin residents who allege no ties to Indiana (Filing No. 39 at 12). As discussed above, the Court does not agree that the Defendants have no ties to Indiana. Where defendants have

23

minimum contacts with the forum state, a defendant must make a compelling case that it would be an undue burden to litigate in the forum state. *See Felland*, 682 F.3d at 677. The Defendants have not sufficiently presented a compelling case here. While it may be more of a burden to litigate in Indiana than in another forum, it is no more burdensome than would be regularly tolerated for an out-of-state defendant. *See id*. It may potentially be even less given that Check and Setzer have travelled to Indiana already in connection with Heartbeat's claims and PSI has leased property within the state. *Cf. Interlease Aviation Invs. II (Aloha) L.L.C v. Vanguard Airlines, Inc.*, 262 F. Supp. 2d 898, 911 (N.D. Ill. 2003) (finding minimal burden for defendants to litigate in Illinois since they had previously traveled there).

Indiana has a substantial interest in adjudicating the dispute, as it has a strong interest in providing relief to its residents for the alleged harm. *See Myer ex rel. B.D.*, 91 F.4th at 863–64. Although Wisconsin may also have an interest with regard to protecting the Defendants, the Court is unconvinced that this interest is stronger, as alleged by Check and Setzer (Filing No. 39 at 13). This is especially the case here given that Check and Setzer have chosen to have Indiana law apply to their Executive Employment Agreements.

Heartbeat's interest in obtaining convenient and effective relief would be served by the current forum. It is an Indiana corporation based in Indiana. As Heartbeat points out, many relevant witnesses and evidence are located in Indiana (Filing No. 45-1 ¶ 11). In regard to obtaining the most efficient result, this balances out the claim made by Check and Setzer that there are also witnesses located in Wisconsin and discovery to be conducted in Wisconsin (Filing No. 39 at 14).

Finally, the Court does not find any additional compelling evidence presented against the fairness of the current forum. The Court finds that it has personal jurisdiction over the Defendants, since the current forum has sufficient minimum contacts with the Defendants such that it comports

24

with the traditional notions of fair play and substantial justice. Accordingly, the Court **denies** Defendants' Motions to Dismiss for lack of personal jurisdiction.

**B.**     **Venue**

The Defendants also argue that this Court is not the proper venue under 28 U.S.C. § 1391 (Filing No. 26 at 13; Filing No. 39 at 10; Filing No. 49 at 8-9; Filing No. 51 at 6). According to that statute, venue is proper when:

A civil action [is] brought in

(1) a judicial district in which any defendant resides, if all defendants are residents of the State in which the district is located;
(2) a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated; or
(3) if there is no district in which an action may otherwise be brought as provided in this section, any judicial district in which any defendant is subject to the court's personal jurisdiction with respect to such action.

28 U.S.C. § 1391(b). A natural person is deemed to reside wherever that individual is domiciled. *Id.* § 1391(c)(1). An entity that is a defendant in the suit is deemed to reside wherever it is subject to personal jurisdiction. *Id.* § 1391(c)(2).

Heartbeat argues that the Defendants are subject to personal jurisdiction, and, therefore, venue is proper (Filing No. 45 at 22). Since PSI is subject to personal jurisdiction in the Southern District of Indiana, it is a resident of the Southern District of Indiana for venue purposes. Heartbeat also argues that the venue is proper under 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to the claim occurred and a substantial part of property that is the subject of the action is situated in this judicial district (Filing No. 45 at 22-23). To prove this, Heartbeat does not need to show that a majority of events related to the case occurred in this district, but rather that a substantial portion occurred in this district. *Allstate Life Ins. V. Stanley W.*

25

*Burns, Inc.*, 80 F. Supp. 3d 870, 877 (N.D. Ill. 2015). It is sufficient to show that the events are part of the historical predicate of the suit. *Id.*

Additionally, more than one district can be a proper venue. *Id.* at 876 (citing *Armstrong v. LaSalle Bank Nat'l Ass'n*, 552 F.3d 613, 617 (7th Cir. 2009)). In the case of tort claims, courts tend to focus on where the tortious actions occurred and where the harm was felt. *See Johnson v. Creighton Univ.*, 114 F. Supp. 3d 688, 697 (N.D. Ill. 2015). For breach of contract claims, courts consider a number of factors, including where performance was to take place and where the breach occurred. *Allstate*, 80 F. Supp. 3d at 877. In analyzing venue, courts have also determined that communication transferred into the forum may satisfy the requirements of 28 U.S.C. § 1391(b)(2). *See Interlease Aviation*, 262 F. Supp. 2d at 913.

In this case, Check and Setzer, through their employment with an Indiana company located in this district, engaged in various activities with its supervisors and other employees, personnel, and contractors that resided in Indiana. They had access to confidential information, including information regarding Indiana customers, that was stored on Indiana-based servers. The compensation they received came from Heartbeat's Indiana bank account. They communicated with customers and prospects in Indiana, including visiting two different prospects in this district.

They also allegedly used confidential information on behalf of PSI to solicit Heartbeat's customers and prospects, including those located in Indiana, as well as Heartbeat service providers. This action allegedly resulted in lost opportunities for Heartbeat. Check also continued to visit Indiana companies in person through his work at PSI. These activities are part of PSI's alleged ongoing targeting of the Indiana market. This strategy includes PSI's previous interest in acquiring Heartbeat and soliciting employees and customers in Indiana, which Heartbeat has shown through

26

communications sent by Malkow to Heartbeat's owner, as well as through information on PSI's website.

Additionally, although it is undisputed that Check and Setzer are residents of Wisconsin, that both Executive Employment Agreements were signed in Wisconsin, and that Check's Executive Employment Agreement was negotiated in Wisconsin, substantial events occurred in Indiana related to these contracts. Both agreements centered on employment with an Indiana company that included work in Indiana. Check and Setzer each reported to a member of the Heartbeat organization that worked and resided in Indiana. Setzer also received training from Indiana-based employees, and Check supervised personnel and contractors in Indiana. They received compensation from Heartbeat's Indiana bank account. As stated above, they also interacted with customers and prospects in Indiana, including two in-person visits to Indiana prospects inside of this district. Finally, soliciting Indiana-based customers using confidential information also allegedly constituted a breach of the Executive Employment Agreements.

For these reasons, the Court finds that Heartbeat has shown that a substantial part of the events or omissions giving rise to the claim occurred in this judicial district and holds that venue is proper under 28 U.S.C. § 1391(b)(2). Accordingly, Defendants' Motions to Dismiss for improper venue is **denied**.

C.    **Transfer**

Since the current venue is proper, the relevant provision for possible transfer is 28 U.S.C. § 1404. In determining if transfer is appropriate, the Court has discretion to consider any

27

factors related to convenience or the interest of justice. *Rsch. Automation, Inc. v. Schrader-Bridgeport Int'l, Inc.*, 626 F.3d 973, 978 (7th Cir. 2010).

Factors that courts consider when analyzing the convenience of the parties and witnesses include the plaintiff's choice of forum, the location of material events, the relative ease of access to sources of proof, the availability of and access to witnesses, and each party's convenience in litigating in each forum. *See, e.g., Id.*; *Deist v. Wash. Univ. Med. Ctr.*, 385 F. Supp. 2d 772, 773 (S.D. Ill. 2005). The plaintiff's choice of forum receives strong weight. *Deist*, 385 F. Supp. 2d at 773. This is especially true when the venue is the plaintiff's home forum, though this factor is limited if another forum has a stronger relationship to the claims. *Id.* at 773–74. In this case, Heartbeat chose to file in Indiana. The case was removed from state court by the Defendants, which has been found to lessen the weight of a plaintiff's choice of forum. *See Deist*, 385 F. Supp. 2d at 774. However, since Heartbeat's arguments demonstrate that its original choice of forum in Clark County, Indiana, was based on being located in that county and the current forum is in the district where Heartbeat resides, the Court finds this factor weighs against transfer.

Material events occurred in Indiana and Wisconsin, so that factor is neutral. Although Check and Setzer claim that Wisconsin will be the main site for discovery, the Defendants do not elaborate on the evidence that will be available, aside from claiming that witnesses will be in Wisconsin (Filing No. 39 at 14). Based on the record, the Court finds evidence could be reasonably located in each forum, and thus this factor is neutral. Both sides argue that there are witnesses in their preferred forum, making this factor neutral as well (*Id.*; Filing No. 45-1 ¶ 11).

The final factor looks at the convenience of the parties litigating in each forum. The Court does not find that Defendants would suffer a substantial burden by litigating in Indiana, especially since Check and Setzer have travelled to Indiana on at least two occasions related to the claims,

28

Check continues to visit Indiana for work, and PSI has a lease in Indiana. Accordingly, the Court finds this factor weighs against transfer.

Turning to the consideration of the interest of justice, courts weigh factors, such as "(1) the Court's familiarity with the applicable law; (2) the speed at which the case will proceed to trial; and (3) the desirability of resolving controversies in their locale." *Deist*, 385 F. Supp. 2d at 774. "The interest of justice may be determinative, warranting transfer or its denial even where the convenience of the parties and witnesses points toward the opposite result." *Rsch. Automation*, 626 F.3d at 978.

Neither side argues that this Court is not familiar with the law in this case. However, the majority of the claims are brought under Indiana law, and the Executive Employment Agreements contain a choice of law provision stating that Indiana law will govern those agreements. Though a court in Wisconsin would be competent in dealing with Indiana law, it is presumed that a court in Indiana would be more familiar with Indiana law. *Cf. Am. Com. Lines, LLC v. Ne. Mar. Inst., Inc.*, 588 F. Supp. 2d 935, 946 (S.D. Ind. 2008) (weighing an Indiana court's greater familiarity with Indiana law against the transfer of a case to the District of Massachusetts). Therefore, this factor weighs against transfer.

Similarly, neither side presents evidence that one district will provide faster relief than the other. One way that Courts will determine speed is comparing the median time between filing and disposition in the districts. *See Commissioning Agents*, 187 F. Supp. 3d at 990. Based on the most recent statistics, the median time between filing and disposition in this district is 9.4 months, and the median time in the Eastern District of Wisconsin is 6.2 months. *See* Federal Court Management Statistics (March 31, 2026), available at https://www.uscourts.gov /sites/default/files/document/fcms_na_distcomparison0331.2026.pdf. This Court does not find a

29

three-month difference in time to be sufficiently significant to warrant transfer. *Cf. Commissioning Agents*, 187 F. Supp. 3d at 990 (finding that a two-and-a-half-month difference was not significant enough to warrant transfer).

Finally, the Court finds that each forum has a desire to resolve the dispute in its locale, making that factor neutral. Considering the factors as a whole, the Defendants failed to meet their burden of proving that the Eastern District of Wisconsin is clearly more convenient than the current forum. Accordingly, the requests to transfer venue are **denied**.

### IV.   CONCLUSION

For the reasons stated above, the Motion to Dismiss filed by PSI (Filing No. 24) is **DENIED,** and the Motion to Dismiss filed by Check and Setzer (Filing No. 38) is **DENIED**. The Defendants' alternative requests to transfer the case to the Eastern District of Wisconsin are also **DENIED**. The Court concludes that it has personal jurisdiction over the Defendants, that the current venue is proper, and that transferring the case to the Eastern District of Wisconsin is not warranted.

**SO ORDERED.**

Date:   7/22/2026

Hon. Tanya Walton Pratt, Judge
United States District Court
Southern District of Indiana

Distribution:

Kathleen I. Hart
RILEY BENNETT EGLOFF LLP
khart@rbelaw.com

Paul L. Jefferson
SLS Group, LLC
pjefferson@slsgroup.law

Lindsay A. Llewellyn
Riley Bennett Egloff LLP
lllewellyn@rbelaw.com

Hannesson Ignatius Murphy
BARNES & THORNBURG, LLP (Indianapolis)
hmurphy@btlaw.com

Kevin Roberts
Barnes & Thornburg LLP
kevin.roberts@btlaw.com

Christopher Rubey
Barnes & Thornburg LLP
crubey@btlaw.com